**DOUGLAS COAL COMPANY, a corporation, Plaintiff,**

**v.**

**UNITED STATES of America, Defendant.**

Civ. A. Nos. 73–69–E, 74–134–E.

United States District Court,
N. D. West Virginia,
Elkins Division.

March 17, 1977.

---

Richard G. Herndon, R. Clark Morton and Judith A. Herndon, Wheeling, W. Va., for plaintiff.

Stephen G. Jory, U. S. Atty., Elkins, W. Va., for defendant.

## MEMORANDUM ORDER

MAXWELL, Chief Judge.

Cross motions for summary judgment are pending in these consolidated actions. The parties agreed to the consolidation, which was effected by order, entered November 25, 1974.

Both actions, brought under 28 U.S.C. § 1346(a)(1), are against the United States to recover corporate income taxes which the Commissioner of Internal Revenue (the "Commissioner") assessed to and collected from Douglas Coal Company ("Douglas"), the Plaintiff in both cases. Civil Action No. 73–69–E relates to calendar years 1967 and 1968 and Civil Action No. 74–134–E relates to calendar year 1969.

Three questions, all relating to the internal revenue laws, are presented:

1. Whether Plaintiff Douglas, which strip-mined coal on two tracts of land under agreement and lease from the Virginia Electric and Power Company ("Vepco"), possessed an "economic interest" in the coal in place in those two tracts which would entitle it to depletion deductions for calendar years 1967, 1968 and 1969.

2. Whether legal fees paid by Douglas in the amounts of $5,000.00 in 1967 and $3,600.00 in 1968 are capital expenditures relating to the acquisition of coal property and therefore not deductible as ordinary expenses.

3. Whether Douglas properly aggregated its Vindex, Maryland, deep mining operation with the balance of its operating mineral (coal) properties for purposes of computing depletion deductions for 1967 and 1968.[1]

After the joinder of issue and the consolidation, Douglas moved for summary judgment on the three issues enumerated above, "rel[ying] upon the pleadings, the exhibits attached thereto, the responses to interrogatories of both parties and the exhibits attached thereto." (Plf.'s Motion, p. 4.) The Government then cross-moved for partial summary judgment, "stat[ing] that based upon the undisputed facts of this case, coupled with the pertinent written documents heretofore filed with the Court, [it] is entitled to judgment . . . as a matter of law." (Gov't's Motion for Partial Summary Judgment, par. 2.) However, in its second brief (page 9), the Government takes the position that issue 3, above, relating to the aggregation of separate mining operations, "is presently not susceptible of summary judgment treatment" because "none of the [critical] facts are properly advanced by plaintiff."[2]

## I. UNDISPUTED FACTS AND HISTORY OF THE CONTROVERSY.

The following matters, unless otherwise indicated, are not in dispute:

In its initial brief, pp. 5–6, Douglas states that it "will concede the matters involved" in the two issues set forth above. (*See also* Plf.'s Motion for Summary Judgment, pars. 8 and 12).

2. With the exception of the aggregation issue, the parties, while formally using the summary judgment mechanism, have dealt with the cases in a way which is tantamount to a submission of the record to the Court for findings and conclusions. For example, in its second brief (p. 3) the Government said: "We . . . ask the Court to adopt the facts and law on the depletion issue that are set forth in our brief heretofore filed."

---

1. Douglas has abandoned the following two issues raised by the complaint in Civil Action No. 73–69–E:

(a) Whether Douglas, in computing its depletion deduction for 1967 and 1968, was required to deduct from its gross income advance royalties paid on certain coal property not in production; and

(b) Whether certain of Douglas' payments to its president ($8,750.00 in 1967 and $6,395.74 in 1968, alleged to be reimbursements for business travel and entertainment expense) were properly deductible as ordinary and necessary business expenses.

1. Douglas, the Plaintiff, is a West Virginia corporation with offices in Elkins, West Virginia. Douglas markets coal which it removes by strip mining. In addition, Douglas has deep mine interests and also markets coal which is deep mined. (1973 Compl., pars. 2, 8(b)).[3]

2. As early as 1964 Douglas contracted to deliver and began to deliver substantial quantities of coal to Vepco at its coal-fired electric generating plant near Mt. Storm in Grant County, West Virginia. Douglas mined this coal on lands which it leased from the Western Maryland Railway Company. (Joseph D. Ristroph Aff't, April 28, 1970, par. 3; see Apr. 11, 1967, and October 1, 1967, agreements between Vepco and Douglas).

3. Later, in the three relevant years, 1967 through 1969, Douglas strip mined coal which it leased from Vepco on two tracts, known as the Herr and Cavitt tracts, in Grant and Tucker counties, West Virginia. Much of the coal from this mining operation was supplied to Vepco at its Mt. Storm power plant. At the same time, Douglas sold coal to Vepco which Douglas mined on other lands. Douglas' operations also included strip mining on coal lands which it leased from the Western Maryland Railroad and which adjoined the Herr and Cavitt tracts. (Plf.'s Interrog. Ans. 1(c)(iii), 11–14;[4] Ristroph Aff't, Apr. 28, 1970; see Gov't's initial brief, pp. 2–3).

4. Douglas' right to strip mine on the Herr and Cavitt tracts in the relevant period, 1967–1969, arose out of three agreements: (i) a "Coal Mining And Delivery Contract" between Douglas and Vepco, dated April 11, 1967, and amended July 1, 1967; (ii) a "Contract and Lease" between Douglas and Vepco, dated October 1, 1967; and (iii) an agreement, dated March 28, 1967, between Douglas and Lee Jackson Shockey, Jo Ann Shockey and Sonja Jean Shockey (hereinafter the "Shockey lease"). These instruments, which are attached to Douglas' interrogatory answers, are summarized in paragraphs 5 through 7, which follow.

5. *The April 11, 1967, Coal Mining And Delivery Contract and the July 1, 1967 Amendment.*

(a) In the April 11, 1967, contract, Vepco granted to Douglas the right to strip mine "all the coal physically and economically feasible" in designated areas on the Herr and Cavitt tracts. Douglas agreed "to deliver the coal mined" to Vepco at the rate of at least 120,000 tons per year. (Art. 1.1.) However, all coal which Douglas shipped to Vepco had to meet certain "quality restrictions and limitations." The inert matter, ash, moisture and sulphur content could not exceed certain levels. There were specifications as to size, and the softening temperature of the ash could not be less than the specified level. Finally, the heat value could not be lower than 11,500 B.T.U.'s per pound unless Vepco agreed "to accept coal of lower heat value." However, "no coal [could] be shipped which [had] a heat value of less than 10,500 BTU/lb." (Art. 2.1.) Indeed, as a further precaution, the contract specifically provided that Vepco would make "[n]o payment . . . for any [rail] car . . . of coal . . . found to have a BTU content below 10,500 BTU per lb." (Art. 5.3).

(b) The contract contained a graduated price table which was geared to B.T.U. content: the higher the B.T.U., the higher the price. The price was "F.O.B. rail car at the Douglas' Tipple." Douglas agreed to "pay all of the costs associated with the mining and delivery of the coal to" rail cars at its tipple. (Art. 5.1).

(c) The price schedule was to "be firm for the term of the contract." However, if Douglas' operation "change[d] from a non-union to a union basis" the contract could be "reopened for price adjustment to reflect

---

3. "1973 Compl." refers to the complaint in civil action 73–69–E, filed May 15, 1973.

4. Although Plaintiff's interrogatory answers, filed in case No. 73–69–E before consolidation, deal only with 1967 and 1968, the Government readily concedes that "[t]he facts and the law are the same for the year 1969 as they were for those years (i. e. 1967 and 1968)." (Government's second brief, p. 3).

the increase[d] cost" of a union operation. (Art. 5.2).

(d) Douglas agreed not to co-mingle coal mined from the Herr and Cavitt tracts with coal mined from other properties (Art. 6.1).[5]

(e) It appears from the contract as a whole that Douglas was entirely in charge of the planning (including engineering) and operation of the Herr/Cavitt stripping enterprise. (*See, e. g.,* Art. 8.1; and Art. 7.1 which provides that "[t]he equipment and techniques employed by Douglas . . . and all other aspects of the mining and delivery of the coal shall be the sole responsibility of Douglas.") However, Douglas could use no techniques which "would impair or destroy the economic potential of [deep] mining" on the Herr and Cavitt tracts. (Art. 7.1).

(f) Douglas was obligated to obtain surface rights to the Cavitt tract "to allow and enable the strip mining of the coal." In addition, Douglas was required to secure a release from the surface owners which relieved Vepco from liability as a result of the mining. (Art. 11.1).

(g) Douglas assumed all risks of the mining operation and specifically agreed to "hold [Vepco] harmless" from any liability and damages resulting from the mining. In particular, Douglas was to carry liability insurance "to the limits required by Vepco." (Arts. 9.1, 10.1).

(h) Douglas agreed "to comply and be solely responsible for such compliance with all applicable rules and regulations of regulatory authorities having jurisdiction" over the mining operation. Specifically, Douglas agreed to do all backfilling and reclamation work and agreed that such work, when done, would "fully comply with the requirements at that time in effect [in] the State of West Virginia." (Arts. 7.2, 7.3).

(i) Douglas agreed to "pay . . . any property tax or severance tax levied on the coal whether billed to Vepco or to Douglas." (Art. 5.1).

(j) The contract was for one year with a year-to-year renewal clause limited to four renewals. (Art. 13.1).

(k) The April 11, 1967, contract was amended on July 1, 1967. The amendment related solely to price and resulted in a price increase to Douglas if the minimum monthly tonnage was delivered and its "weighted average heat value [was] 11,500 BTU per pound or greater."

6. *The October 1, 1967, Contract and Lease.* The Herr and Cavitt tracts were the subject of a later (October 1, 1967) "Contract and Lease" between Douglas and Vepco which expressly "cancelled and superseded" the Coal Mining and Delivery Contract of April 11, 1967. (Art. 17.1). Many of the provisions of the new lease were lifted verbatim from the "contract" it replaced: The quality restrictions, including B.T.U. requirements, on coal supplied to Vepco were the same; Vepco did not have to pay for any car of coal "found to have a heat value below 10,500 BTU/lb." Douglas' obligations as to reclamation, taxes, the acquisition of surface rights and general responsibility (and liability) for the mining operation continued; and the price table was identical to that in the July 1, 1967, amendment to the earlier contract.

Certain new provisions emerged in the October 1, 1967, contract and lease:

(a) Under the October 1967 instrument, Vepco "lease[d] . . . unto Douglas all coal economically recoverable by the strip mining method on the Herr and Cavitt Tracts . . . in the areas identified." It appears that the mining area was enlarged from the earlier contract. "Additional areas [could] be added at a later date by mutual consent of both parties." (Art. 1.1).

(b) The amount of coal Douglas supplied to Vepco increased greatly under the new

---

5. Douglas and Vepco apparently applied the co-mingling prohibition only to Herr/Cavitt coal which met the quality standards in the April 1967 contract because Douglas mixed Herr/Cavitt coal not acceptable to Vepco with coal from Douglas' other mines. (Plf.'s Interrog. Ans. 12–14).

contract and lease. The supply was to increase gradually until May 1968, and thereafter Douglas would supply Vepco at the minimum rate of 440,000 tons of coal per year. The contract and lease provided that Douglas' failure to meet minimum supply schedules would not be a breach if the failure was "due to the unavailability of sufficient coal meeting the quality standards set forth in [the contract]. In such event, Douglas [had] the right to supplement the tonnages produced on the Herr and Cavitt Tracts with coal from other sources to . . . meet the minimum . . . schedule." (Art. 1.1).

(c) The price schedule in the October 1967 contract and lease could be adjusted upward if Douglas changed from a non-union to a union operation. Such adjustment would only reflect increased production costs and could not exceed 70 cents per ton. The agreement could be re-opened for general price adjustment each year in August. However, any "increase or decrease [could] not exceed 5.0% of the then existing price being paid by Vepco to Douglas." (Art. 5.2).

(d) Prior to mining under the new lease, Douglas had to "furnish Vepco with a general plan showing . . . proposed mining operations." The plan had to be revised at twelve-month intervals to project operations for the next twelve months. Such plans had to be approved by Vepco. (Art. 8.1).

(e) "Nothing [in the new lease was to] be interpreted as establishing between [Vepco and Douglas] the relationship of partners, joint adventurers, cotenants, principal and agent or master and servant." (Art. 11.1).

(f) For $2,000.00, Vepco sold Douglas the standing timber on portions of the Herr/Cavitt land. In removing the timber, Douglas agreed "not [to] allow hazardous or unsightly conditions to exist." (Art. 9.2). Douglas asserts that this timber was really "unwanted." (Plf.'s Interrog. Ans. 1(c)).

(g) The October 1967 contract and lease was for a term of five years and was renewable thereafter on a year-to-year basis on written notice from Vepco to Douglas. (Art. 14.1).

7. *The Shockey Lease, dated March 28, 1967.* Vepco did not own the surface of the Cavitt tract; therefore, Douglas had to acquire surface rights before mining under any coal lease from Vepco. (*See* Apr. 11, 1967, Coal Mining and Delivery Contract, Art. 11; Exh. B to Refund Claim, attached to 1973 Compl.) The pertinent provisions of the Shockey Lease are as follows:

(a) The Shockeys "grant[ed] and convey[ed] unto" Douglas the "right to enter on and conduct surface mining operations," including "the right to build roads and haulageways, storage areas, and other facilities necessary to produce coal."

(b) In return Douglas agreed to pay the Shockeys a royalty of 10 cents "for each ton of coal shipped from the premises." Upon execution of the lease, Douglas advanced the Shockeys $2,500.00 "to be applied to the first royalties due." In addition, Douglas agreed to build an access road to a camp maintained by the Shockeys.[6] Douglas was obligated to "obtain all necessary [mining] permits and post all necessary bonds"; it would reclaim the surface in accordance with West Virginia law. Finally, Douglas agreed to "save harmless the [Shockeys] from any loss incurred" by reason of Douglas' mining operation.

8. After execution of the foregoing instruments, Douglas began mining on the Herr and Cavitt tracts. In connection with the operation, Douglas built a one and one-half mile access road on the Herr tract at a cost of $20,000.00 and a one-half mile access road on the Cavitt tract at a cost of $7,000.00. Various other haulageways were also constructed. (Plf.'s Interrog. Ans. 1(c)(iii)).

---

6. Douglas estimated the cost of the road to the Shockey camp at $6,000.00. (Plf.'s Interrog. Ans. 1(c)(v)).

9. From the two tracts Douglas stripped and delivered the following tonnage to Vepco (Plf.'s Interrog. Ans. 11):

| Year | Herr Tract | Cavitt Tract |
|------|-----------|--------------|
| 1967 | 8,401 tons | 121,681 tons |
| 1968 | 202,770 tons | 82,770 tons |

Although no exact figures are in the record, it is undisputed that in 1969 Douglas again delivered substantial quantities of coal to Vepco from the Herr and Cavitt tracts. (*See generally* 1974 Compl. and attachments;[7] *See also* footnote 4, *supra.*)

10. Depending upon B.T.U. content, Douglas received between $2.16 and $3.22 per ton for Herr/Cavitt coal sold to Vepco in 1967 and 1968. In the same period, Vepco paid Douglas between $2.31 and $3.56 per ton for comparable coal from Douglas' other mines. Accordingly, Herr/Cavitt coal was discounted between 15 and 34 cents per ton, which is a percentage discount of between 6.5 and 9.5 per cent. Douglas takes the position that the discount was "the equivalent of a royalty to" Vepco. (Plf.'s Interrog. Ans. 1(c)(ii)).

11. Some of the Herr/Cavitt coal mined by Douglas in the years in question was "unacceptable to Vepco" because it "failed to meet minimum [quality] standards." This coal was "mixed with coal from [Douglas'] other mines" for sale to customers other than Vepco. Douglas has no records which "provide the exact tonnage of the [Herr/Cavitt] coal which failed to meet minimum specifications." (Plf.'s Interrog. Ans. 12–14).

12. In the years in question, Douglas "had no building, machine or piece of equipment used in connection with its strip mining operations on the Herr and Cavitt tracts which was not made the subject of a depreciation deduction for federal income tax purposes." In fact, Douglas "had no operating cost or expense incurred" in the Herr/Cavitt mining "which was not made

the subject of a business expense deduction" for tax purposes. (Plf.'s Interrog. Ans. 2–6).

13. Douglas made timely filings of its corporate income tax returns for the calendar years 1967, 1968 and 1969 and paid the taxes shown due on those returns (1973 Compl., par. 4, and Ans. thereto, par. 4; 1974 Compl., par. 4, and Ans. thereto, par. 4).

14. In its pleadings, Douglas advances the following figures on the depletion allowance question as to the Herr and Cavitt tracts:

(a) For 1967, Douglas *alleges* that it reported to the I.R.S. $2,722,426.24 in total gross income from the sale of coal, including $367,691.05 from the Cavitt tract and $28,560.58 from the Herr tract. After deducting $143,370.92 in royalties paid and $6,000.00 for a miscellaneous item, Douglas calculated a depletion allowance of $257,-304.53 which it claimed as a deduction in calculating taxable income for 1967. (1963 Compl., par. 8(d)).

(b) For 1968, Douglas *alleges* that it reported to the I.R.S. $2,658,336.24 in total gross income from the sale of coal, including $279,028.37 from the Cavitt tract and $688,345.99 from the Herr tract. After deducting $58,085.54 in royalties paid, Douglas calculated a depletion allowance of $260,-025.04 which it claimed as a deduction in calculating taxable income for 1968. (1973 Compl., par. 8(e)).

(c) For 1969, Douglas *alleges* that it reported to the I.R.S. $2,849,066.76 in aggregate gross income from the sale of coal, including $16,963.58 from the Cavitt tract and $719,033.93 from the Herr tract. After deducting $73,402.50 in royalties paid, Douglas calculated a depletion allowance of $277,566.43 which it claimed as a deduction in calculating taxable income for 1969. (1974 Compl., par. 8(f)).[8]

---

7. "1974 Compl." refers to the complaint in Civil Action No. 74–134–E, filed July 8, 1974.

8. In its answers, the Government claims that it "is presently without sufficient information or knowledge to form a belief as to the truth of

the allegations" concerning the sales figures which Douglas says it utilized in calculating the depletion allowance. (Ans., par. 8, action no. 73–69–E; Ans., par. 8, action no. 74–134–E). The Government, however, appears to accept these figures in its initial brief (p. 3). The

Douglas calculated its depletion for the three years by taking 10 per cent of its aggregated gross income from mineral (coal) properties, which amount did not exceed 50 per cent of Douglas' taxable income from the properties computed without allowing for depletion.

15. In October 1970, the Commissioner made assessments of deficiencies in corporate income taxes against Douglas in the amount of $25,558.48 for 1967 and $59,-741.78 for 1968. In February 1972 a deficiency of $43,299.76 was assessed for 1969. (1973 Compl., par. 5 and Ans. thereto, par. 5; 1974 Compl., par. 5 and Ans. thereto, par. 5).

16. Much of the assessed deficiencies in each of the three years resulted from the Commissioner's disallowance of "the depletion deduction claimed by Douglas on that portion of its gross income that was derived from sales of coal [to Vepco] from the Cavitt and Herr tracts." (Gov't's initial brief, p. 4). The Government summarizes I.R.S. reports on the depletion disallowance as follows:

> Depletion claimed is being disallowed by the amount of depletion claimed on the Herr and Cavitt tracts. The governing written instruments involving these tracts did not convey an economic interest in the coal which is necessary to claim depletion under Section 611 of the Internal Revenue Code of 1954.

> \* \* \* \* \* \*

> The taxpayer, under the terms of the governing instruments, merely obtained an economic advantage and did not acquire an economic interest in the coal in place. (Gov't's Interrog. Ans. 6).

An I.R.S. valuation engineer was not involved in the decision to disallow depletion for 1967–1969 on the Herr and Cavitt tracts. (Gov't's Interrog. Ans. 3).

17. Douglas alleges that it paid the assessed deficiencies for 1967 and 1968 in the amount of $85,300.26, with $10,063.54 in interest, in November 1970. (1973 Compl., par. 6). The Government acknowledges receipt of

> advance payments on the deficiencies for 1967 and 1968 in the aggregate amount of $95,363.80 on November 13, 1970, which advance payments were applied to the deficiencies . . ., with the remaining $19.87, plus interest of .32 being applied back as a credit to the year 1962. (Ans., par. 6).

The parties agree that in March 1973 Douglas paid the deficiency assessment for 1969 in the amount of $43,299.76, together with $5,086.24 in interest. (1974 Compl., par. 6, and Ans. thereto, par. 6).

18. Douglas filed refund claims to recover the deficiency assessments paid for 1967, 1968 and 1969. (1973 Compl., par. 7; 1974 Compl., par. 7.) This refund claim effort was obviously unsuccessful. With the unsuccessful refund claims, Douglas filed the April 28, 1970, affidavit of Joseph D. Ristroph, manager of power production for Vepco. Copies of the refund claims, which include the Ristroph affidavit, are attached to both complaints. A copy of the affidavit, which has been ignored by the Government in his litigation, also appears in the appendix to Douglas' initial brief. Douglas urges the Court to rely on the following paragraphs of the Ristroph affidavit:

> That negotiations were undertaken with Douglas Coal Company for the lease by Virginia Electric and Power Company of all of the strip coal economically mineable from the Herr and the Cavitt tracts. That by reason of its operations immediately adjacent to the property, Douglas Coal Company appeared to be in the best position to place the mining operation on the tracts into quick and efficient operation and an agreement dated April 11,

Court refers to these figures simply to convey some idea of the amount in issue, and the Court does not consider the figures established for purposes of calculating the dollar amount of any recovery. In any event, as the parties recognize, resolution of the critical issue before the Court—whether Douglas had an economic interest in the Herr/Cavitt coal which entitled it to depletion—does not require a prior determination of the exact amount of the depletion claimed.

1967, was negotiated and executed between Virginia Electric and Power Company and Douglas Coal Company.

That in his negotiations with Douglas Coal Company for the lease of coal mining rights in the Herr and Cavitt tracts, the matter of depletion as permitted by the Internal Revenue Laws was discussed at considerable length and it was agreed between the parties and it was the intent of Virginia Electric and Power Company to transfer to Douglas Coal Company a sufficient economic interest in the coal in place so as to entitle said Douglas Coal Company to claim depletion in the matter as permitted by law.

That his negotiations, in general, were based upon the existing contract between Douglas Coal Company and Virginia Electric and Power Company for the sale by Douglas and the purchase by Virginia Electric of coal mined from the Western Maryland Railroad Company property leased to Douglas Coal Company. That the prices to be paid Douglas Coal Company were based upon the representative market price paid by Virginia Electric and Power Company, f. o. b. its Mt. Storm facility, for comparable coal produced by non-union operators, less a discount intended to represent the equivalent of royalty payments.

That Virginia Electric and Power Company has not, at any time, claimed any depletion on the gross income from the coal produced and sold from the Herr and Cavitt tracts.

 * * * * * *

That the purpose of Virginia Electric and Power Company in contracting for the purchase of all coal of a minimum quality produced from the leasehold estate was not intended to deprive Douglas Coal Company of depletion on coal produced but rather the purpose was to provide Virginia Electric and Power Company an increased supply of coal produced in an area immediately adjacent to its Mt. Storm facility where the freight costs applicable to the delivery of said coal were at a minimum level.

19. In an obvious effort to prevent future depletion allowance difficulties on the Herr and Cavitt tracts, Douglas and Vepco entered into a Supplementary Agreement, dated January 1, 1970, with respect to those tracts. That agreement contained certain new provisions:

(a) The specific statement "that it is the intent of [the parties] that Douglas acquire an economic interest in the coal leased" was added. (Art. 5.1).

(b) "For all [Herr/Cavitt] coal produced by Douglas . . . in excess of the monthly tonnage" requirements of the contract, "Douglas grant[ed] to Vepco a first refusal right . . . to purchase said excess production at the" contract price. (Art. 1.3).

(c) Douglas agreed to pay a 5% royalty to Vepco for all Herr/Cavitt coal which Douglas sold to others. The royalty also applied to coal which did not meet quality standards specified in the contract. (Art. 1.4).

(d) The agreement states that the price schedule

was arrived at through negotiations upon the basis of taking a representative market price paid by Vepco for purchase of coal of like quality from similar producers, f. o. b. shipping point, less a credit intended to represent a royalty of 5% to Vepco as lessor of the coal. (Art. 5.1).

Many provisions, such as the following, were unchanged:

(a) The minimum monthly tonnage to be shipped remained at 45,000 tons.

(b) The price adjustment terms were identical to the October 1, 1967, contract. If Douglas changed from a non-union to a union operation, the price could be adjusted upward to reflect increased production costs, but such upward adjustment could not exceed 70 cents per ton. In addition, the agreement could be re-opened for general price adjustment each year in August. However, the "price increase or decrease [could] not exceed 5.0% of the then existing price being paid by Vepco to Douglas." (Art. 5.2).

(c) The Supplemental Agreement adopted the term of the October 1, 1967, contract, which was five years from October 1, 1967. Accordingly, the Supplemental Agreement would be effective for at least two years and ten months. At the end of the term, the lease could be renewed "on a year-to-year basis by the mutual agreement of the parties." (Art. 14.1).[9]

20. In September 1972, Douglas requested "technical advice [from the I.R.S.] concerning whether" the Supplementary Agreement of January 1, 1970, "gave Douglas an economic interest in the coal deposits and therefore the right to percentage depletion on the coal mined in 1970." The I.R.S. national office furnished a technical advice memorandum on January 3, 1973. The memorandum was prepared by a mining engineer (and approved by his superiors) in the Mining and Timber Section, Engineering and Valuation Branch, Income Tax Division, in the I.R.S. national office in Washington, D. C. The memorandum provides, in pertinent part:

> Under the terms of the Agreement, Douglas looked to Vepco for payment for the coal it sold to Vepco, and to third parties for payment for the coal sold to them. The price of the coal sold to Vepco was determined through independent negotiation, as was the price of coal sold to third parties. Under the agreement Douglas acquired the exclusive right to mine the coal subject only to the restrictions for preserving other coal reserves owned by Vepco.
>
> The Agreement was not terminable by either party on short notice and embraced a period of two years and ten months or longer if needed to exhaust the coal reserves.
>
> . . . In the instant case the evidence shows that the intent of the lessor was to surrender to the lessee an economic interest in the coal in place, and further the royalty of 5 percent of the sale

price cannot be considered as only a reduction or offset to the sales price because the same royalty applies to coal sold to third parties.

> Accordingly, the Supplementary Agreement dated January 1, 1970, between Vepco and Douglas gave Douglas an economic interest in the coal deposits and therefore the right to percentage depletion on the coal mined and sold thereunder in 1970, under sections 611 and 613 of the Code.

21. Turning to the second question presented, for the year 1967, the Commissioner disallowed as an ordinary and necessary business expense $5,000.00 in attorney's fees on the basis that the Expense was in connection with the acquisition of coal tracts and leases and was therefore a capital expenditure.

The Commissioner's deficiency assessment for 1967, which Douglas paid, took into account the disallowance of this $5,000.00 as an ordinary and necessary expense. The parties now

> agree . . . that if this Court were to find that plaintiff is entitled to the depletion deduction, then plaintiff would necessarily have to abandon its position that the aforesaid legal expenses incurred in 1967 were ordinary and necessary rather than capital in nature.

The parties also "agree that the converse is true." (Gov't's second brief, p. 10; *see* Plf.'s initial brief, pp. 21–22).

22. For the taxable year 1968, the Commissioner also disallowed as an ordinary and necessary business expense $3,600.00 in attorney's fees, also on the basis that the fees were a capital expense incurred in acquiring coal tracts and leases. The Commissioner's deficiency assessment for 1968, which Douglas paid, also took into account the disallowance of this item. Douglas, in an uncontroverted interrogatory answer, states:

---

**9.** Both sides in this litigation acknowledge the existence of the January 1, 1970, Supplementary Agreement, and it is referred to in the record. Since the agreement has not previously been made a part of the record, the Court will

direct the Clerk to file the copy which is a part of the appendix to Douglas' initial brief. The Court, of course, notes that the Government questions the relevancy of the 1970 agreement. *See* Footnote 15, *infra*.

The entire legal fee of $3,600.00 paid by Plaintiff to attorney [Jack R.] Nuzum in 1968 was for legal services rendered Plaintiff by the said attorney during 1968 in connection with matters other than those pertaining to the acquisition of property and coal lands and the attendant preparation of deeds. (Plf.'s Interrog. Ans. 18(a)).

According to Mr. Nuzum, the $3,600.00 was for "collections, judgments and suits." (Plf.'s Interrog. Ans. 18(b) and Exh. 5 thereto).[10]

23. As to the third question presented, on its tax returns for 1967 and 1968, Douglas aggregated its Vindex, Maryland, deep mine operation with the balance of its operating coal properties for purposes of computing depletion deductions. Douglas had previously elected with I.R.S. "to aggregate all of its mineral interests into a single operating unit." [11] In assessing deficiencies against Douglas for 1967 and 1968, the Commissioner treated "the Vindex Mine operation as a separate operating unit" and allocated certain "administrative costs to such operation." Douglas did not seek the Commissioner's consent to treat the Vindex mine separately. It appears undisputed that the Commissioner's treatment of the Vindex mine as a separate unit accounted for a portion of the 1967 and 1968 deficiency assessment, which was paid by Douglas as noted earlier.[12]

## II. THE LAW APPLIED TO THE FACTS OF THIS CASE.

A. *The Depletion Issue.*

The Supreme Court has often said that the purpose of the allowance for depletion is to compensate the owner of wasting mineral assets for the part exhausted in production, so that when the minerals are gone, the owner's capital and his capital assets remain unimpaired. *Paragon Coal Co. v. Commissioner of Internal Revenue*, 380 U.S. 624, 631, 85 S.Ct. 1207, 1211, 14 L.Ed.2d 116 (1965).

The depletion allowance, however, is a matter of legislative grace, so the Court must first look to the relevant portions of the Code and regulations.

Section 611(a) of the Internal Revenue Code provides:

In the case of mines . . . [and] other natural deposits . . . there shall be allowed as a deduction in com-

---

10. It appears that at one stage of its dealings with I.R.S. Douglas took the position that the $3,600.00 paid to Mr. Nuzum in 1968 was an "ordinary business expense" because it was "paid . . . for negotiations with respect to property which was never acquired by the taxpayer-corporation." (Exh. A to Form 843, dated October 8, 1971, and attached to 1973 Compl.; *See* 1973 Compl., and *compare* par. 8(f) *with* par. 9(e)). Perhaps this was because Mr. Nuzum's initial "statement of services rendered [was] lost, mislaid or not received by [Douglas]." (Plf.'s Interrog. Ans., Exh. 5).

11. On its original 1964 tax return, Douglas computed a deduction for percentage depletion by segregating the five mine properties, three of which operated at a profit and the two other mines operated at a loss. There was an overall loss from the five mines. (Plf.'s Interrog. Ans., Exh. 4).
Later, in 1966, Douglas filed an amended 1964 return which aggregated the properties, thereby eliminating a depletion deduction for 1966. (Since there was an overall loss with the aggregation, no depletion deduction was possible). An I.R.S. agent's audit report on the amended

1964 return approved the elimination of the depletion deduction as follows:
The elimination of this deduction is because of taxpayer's prior years election under I.R. Code Section 614(c) to aggregate the separate mineral properties for the purpose of the depletion deduction. The prior years election is binding for succeeding years unless consent to change has been obtained from the Commissioner of Internal Revenue to change the method. The consent to change has not been requested or obtained, and therefore the amended 1964 return is correct in the elimination of this item.

12. In its initial brief (p. 21), Douglas says that "for subsequent years 1969 and 1970, the Commissioner reversed himself again in his audit report and treated plaintiff's several operating properties [including the Vindex mine] as a single operating unit for depletion purposes." Although not in issue here, this would appear to be correct since the complaint in civil action no. 74–134–E, which relates to Douglas' 1969 tax return, does not contain a claim concerning aggregation.

puting taxable income a reasonable allowance for depletion . . . according to the peculiar conditions in each case . . . .

Section 613 establishes the percentage depletion allowances.

The applicable Treasury Regulation, 26 C.F.R. 1.611–1, provides in pertinent part:

(b) *Economic interest.* (1) Annual depletion deductions are allowed only to the owner of an economic interest in mineral deposits or standing timber. An economic interest is possessed in every case in which the taxpayer has acquired by investment any interest in mineral in place or standing timber and secures, by any form of legal relationship, income derived from the extraction of the mineral or severance of the timber, to which he must look for a return of his capital. . . .
A person who has no capital investment in the mineral deposit or standing timber does not possess an economic interest merely because through a contractual relation he possesses a mere economic or pecuniary advantage derived from production. For example, an agreement between the owner of an economic interest and another entitling the latter to purchase or process the product upon production or entitling the latter to compensation for extraction or cutting does not convey a depletable economic interest.
. . . . .

The "economic interest" test was first enunciated by the Supreme Court in *Palmer v. Bender,* 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489 (1933):

The language of the statute is broad enough to provide, at least, for every case in which the taxpayer has acquired, by investment, any interest in the [mineral] in place, and secures, by any form of legal relationship, income derived from the extraction of the [mineral], to which he must look for a return of his capital. (*Id.* at 557, 53 S.Ct. at 226).

The Court in *Palmer* also said "[t]hat the allowance for depletion is not made dependent upon the particular legal form of the taxpayer's interest in the property to be depleted . . . ." (*Id.*)

The Supreme Court attempted to refine the *Palmer* test in *Helvering v. Bankline Oil Co.,* 303 U.S. 362, 367, 58 S.Ct. 616, 618, 82 L.Ed. 897 (1938):

But the phrase "economic interest" is not to be taken as embracing a mere economic advantage derived from production, through a contractual relation to the owner, by one who has no capital investment in the mineral deposit.

*Palmer* and *Bankline* are landmark cases because, as the Supreme Court observed in *Parsons v. Smith,* 359 U.S. 215, 223, 79 S.Ct. 656, 662, 3 L.Ed.2d 747 (1959),

In his first regulations prescribed under the Internal Revenue Act of 1939, the Commissioner adopted almost literally the language . . . quoted [above] from *Palmer* and *Bankline* as the tests to be administratively applied in determining what interest in mineral deposits are entitled to the depletion allowance.

That language, with immaterial changes, appears in the regulation applicable here, 26 C.F.R. § 1.611–1(b)(1), *supra.*

■ Although the "economic interest" concept from *Palmer* and *Bankline* has endured, courts have not always found it easy to draw the line between an "economic interest" and an "economic advantage." 4 Mertens, The Law of Federal Income Taxation § 24.21 (1973), pinpoints the problem:

[T]here has been alternatively contraction and expansion in the application of the "economic interest" test originally enumerated in *Palmer v. Bender.* That alternative contraction and expansion has resulted in making the line of demarcation setting off "economic interest" from "economic advantage" an elusive one.

In recent times the Supreme Court has passed on the "economic interest" questions in two coal depletion cases, *Parsons v. Smith,* 359 U.S. 215, 79 S.Ct. 656, 3 L.Ed.2d 747 (1959), and *Paragon Coal Co. v. Commissioner of Internal Revenue,* 380 U.S. 625, 85 S.Ct. 1207, 14 L.Ed.2d 116 (1965).

In *Parsons v. Smith,* the Supreme Court rejected the claims of mining contractors who contended that

their contractual right to mine coal from the designated lands and the use of their equipment, organizations and skills in doing so, should be regarded as the making of a capital investment in, and the acquisition of an economic interest in, the coal in place. (359 U.S. at 224, 79 S.Ct. at 663).

In its holding, the Court in *Parsons* enumerated seven factors which barred the depletion allowance:

To recapitulate, the asserted fiction is opposed to the facts (1) that petitioners' investments were in their equipment, all of which was moveable—not in the coal in place; (2) that their investments in equipment were recoverable through depreciation—not depletion; (3) that the contracts were completely terminable without cause on short notice; (4) that the landowners did not agree to surrender and did not actually surrender to petitioners any capital interest in the coal in place; (5) that the coal at all times, even after it was mined, belonged entirely to the landowners, and that petitioners could not sell or keep any of it but were required to deliver all that they mined to the landowners; (6) that petitioners were not to have any part of the proceeds of the sale of the coal, but, on the contrary, they were to be paid a fixed sum for each ton mined and delivered, which was, as stated in *Huss [v. Smith]* [255 F.2d 599, 600 (3rd Cir. 1958)], agreed to be in "full compensation for the full performance of all work and for the furnishing of all [labor] and equipment required for the work"; and (7) that petitioners, thus, agreed to look only to the landowners for all sums to become due them under their contracts. (Id. at 225, 79 S.Ct. at 663).

In *Paragon Coal Co.,* the issue was whether the lessee of coal lands is entitled to depletion on all the gross income derived from the sale of the coal mined from its leases, or whether contract miners who do the actual mining for the lessee acquire a depletable interest to the extent they are paid by the lessee. The contract miners delivered all coal mined to the lessee who marketed it. The miners claimed to have an economic interest in the coal in place by reason of their investment in equipment, roadways, buildings, the costs of opening the mine (a drift mine) and the installation of track inside the mine. All of the contractors' expenditures were deductible for tax purposes without resort to depletion. The contractors also contended that they had the right to mine certain designated areas to exhaustion. The Court in *Paragon* held that *Parsons* was controlling and reiterated the seven factors from *Parsons* which are to be considered in determining whether a coal mining contract gives the miner any economic interest in the coal in place.

The Supreme Court in *Paragon* denied the depletion to the contract miners, relying heavily on the conclusion that the miners "did not look to the coal but to Paragon [the lessee] for their payment." (380 U.S. at 638, 85 S.Ct. at 1214.) In particular, the Court said:

Paragon [the lessee] was bound to pay the posted fee regardless of the condition of the market at the time of the particular delivery and thus the contract miners did not look to the sale of coal for a return of their investment, but looked solely to Paragon to abide by its covenant. (380 U.S. at 635, 85 S.Ct. at 1213.)

The Court in *Paragon* also emphasized that satisfying one of the seven criteria for depletion under *Parsons, i. e.,* having

the right to mine even to exhaustion, without more, does not constitute an economic interest under *Parsons,* but is "a mere economic advantage". (380 U.S. at 634, 85 S.Ct. at 1212.)

*Paragon* accordingly suggests that none of the seven criteria in *Parsons* can be considered in isolation. *Cf. Bakertown Coal Company, Inc. v. United States,* 485 F.2d 633, 639, 202 Ct.Cl. 842 (1973). No single criterion is controlling. Instead, all of "the peculiar conditions in each case" must be examined. (26 U.S.C. § 611(a).)

Both sides in this litigation appear to agree that the general principles outlined above are controlling here. Each side, however, maintains that those principles require the entry of summary judgment in its favor on the depletion issue. This Court is of the opinion, for the reasons which follow, that Douglas is entitled to summary judgment on the depletion allowance question.

■ The Court first considers the seven factors in *Parsons, supra.* Three of the factors are closely related and may be considered together:

(1) [whether the miner's] investments were in their equipment . . . —not in the coal in place; (2) [whether] their investments in equipment were recoverable through depreciation—not depletion; . . . (4) [whether] the landowners did not agree to surrender and did not actually surrender to [the miner] any capital interest in the coal in place. (*Parsons, supra,* 359 U.S. at 225, 79 S.Ct. at 663.)

The three factors above boil down to the simple question of what interest Douglas had in the coal within the Herr and Cavitt tracts during the relevant period, 1967 to 1969. The applicable agreements between Douglas and Vepco are, of course, important to this inquiry because the Supreme Court in *Parsons* recognized that "the parties might have provided in their contracts that petitioners [the miners] would have some capital interest in the coal in place." (359 U.S. at 226, 79 S.Ct. at 663.)

The two applicable agreements between Douglas and Vepco are the April 11, 1967, Coal Mining and Delivery Contract and the October 1, 1967, Contract and Lease, which cancelled and superseded the April 1967 contract.

The October 1967 agreement (and the April 1967 one as well) was both a lease and a coal supply agreement. Vepco was both a lessor and a consumer of coal. The Court believes that these two categories need to be distinguished in order to determine what interest Douglas acquired in the coal.

As lessor, Vepco "lease[d] . . . unto Douglas all coal economically recoverable by the strip mining method on the Herr and Cavitt Tracts . . . in the areas identified." Further, as lessor, Vepco rid itself of, and required Douglas to assume, all of the obligations attending the ownership and production of the coal:

(1) Douglas agreed to pay all taxes levied on the coal.

(2) Douglas was to be entirely responsible for the planning, engineering and operation of the mining enterprise; Douglas specifically assumed all risks of the mining operation and agreed to hold Vepco harmless from any liability; to the latter end, Douglas would carry liability insurance "to the limits required by Vepco."

(3) Douglas agreed "to comply and be solely responsible for such compliance with all applicable rules and regulations of regulatory authorities having jurisdiction" over the mining operation; in particular, Douglas was obligated to do all reclamation work in a manner which would "fully comply with [West Virginia] requirements . . . in effect" at the time of reclamation; this presumably required Douglas to obtain all necessary permits and to post the required bonds to insure proper reclamation.

The foregoing are extremely unusual burdens for a mere hireling, or contract miner, to assume. Instead, they appear to be obligations which accompany an economic interest in the coal in place.

Vepco, in its role as lessor, also required Douglas to obtain surface rights to the Cavitt tract "to allow and enable the strip mining of the coal." Douglas was also required to secure a release from the surface owners which relieved Vepco from liability as a result of the mining. Douglas complied with these provisions. In the Shockey lease, the surface owners "grant[ed] and convey[ed] unto" Douglas the "right to enter . . . and conduct surface mining operations" on the Cavitt tract. In return, Douglas agreed to pay to surface owners a 10 cents per ton royalty. (Douglas paid an advance royalty of $2,500.00). Vepco did

not reimburse Douglas for the cost of the surface rights for the Cavitt tract. Vepco paid the same price for coal from both tracts, even though Douglas' costs on the Cavitt tract were higher by reason of the Shockey lease. Again, it seems unusual to require a contract miner, who mines coal for a set fee per ton, to bargain independently with and purchase rights from surface owners without reimbursement from an employer. Instead, such independent dealing identifies Douglas as a producer or entrepreneur attempting to place a mineral interest in production.

At least one Court has held "that the acquisition of surface rights by [a coal company], coupled with the [company's strip mining] lease which requires such acquisition, was sufficient in the aggregate to constitute an economic interest for depletion purposes." *Winters Coal Co., Inc. v. C.I.R.,* 496 F.2d 995, 1000 (5th Cir. 1974). The Court in *Winters Coal* reasoned that once the coal company acquired surface rights, "[i]t became an indispensable party to the exploitation of [the] coal." (*Id.* at 1001). Here, once Douglas acquired the surface lease on the Cavitt tract, it too became an indispensable party to any strip mining production on that tract.

Finally, as lessor, Vepco required Douglas to buy $2,000.00 of standing timber which was on "areas designated." Douglas claims that it did not really want the timber. It seems odd that a miner, operating simply as a seller of services, would be required to buy standing timber, which is an incident of surface ownership.

The Court now turns to the consideration of Vepco as purchaser and consumer of coal under the 1967 agreements and leases with Douglas. The Court believes that such consideration reveals several important clues which show that Vepco did not intend to retain any interest in the strippable coal in place on the Herr and Cavitt tracts.

Vepco was in the business of producing electricity with coal-fired generators at its Mt. Storm plant. Vepco burned enormous quantities of coal. The coal supply aspects of the agreements in this litigation place primary emphasis on Vepco's role as a consumer of coal. Vepco's paramount interest was to insure itself an adequate supply of coal.

Under the October 1967 agreement, Douglas could supplement Herr/Cavitt tract production with coal from other sources to meet the minimum supply requirements for Vepco if the Herr/Cavitt coal failed to meet the contractual quality standards. This shows that Vepco viewed Douglas as a producer of coal, not as a seller of services who simply delivered whatever was mined. Douglas had obligated itself to find coal of acceptable quality for Vepco. If Douglas couldn't produce the requirements from Herr/Cavitt coal, then it had to turn to other sources.

Under the 1967 agreements and leases, Vepco sought no return on coal mined from the Herr and Cavitt tracts which did not meet Vepco's quality requirements. Douglas simply mixed this substandard coal at its tipple and sold it to other customers. From the record, it appears that Vepco received no royalty payments for this substandard coal in the years 1967, 1968 and 1969.[13] Vepco's position with respect to the inferior coal further establishes that it retained no economic interest in the coal in place.

On the basis of the foregoing, this Court holds as to criteria 1, 2 and 4 in *Parsons* that Douglas had an investment in the coal in place; and that Vepco agreed to surrender and actually surrendered to Douglas a capital interest in the coal in place. (*See Parsons,* 359 U.S. at 225, 79 S.Ct. 656).[14]

13. From 1970 on, Vepco received a royalty of 5 per cent of the sales price on Herr/Cavitt coal which Douglas sold to customers other than Vepco. (Supplementary Agreement, January 1, 1970.)

14. Douglas did of course have certain equipment investments which were recoverable through depletion. This, however, does not negate the point that Douglas' investment in the coal itself could only be recovered through depletion.

The Court now turns to another of the *Parsons* criteria:

(3) [whether] the contracts were completely terminable without cause on short notice. (*Parsons, supra,* 359 U.S. at 225, 79 S.Ct. at 663.)

As noted previously in this opinion, the Supreme Court has held that the right to mine to exhaustion, without more, does not constitute an economic interest in the coal in place. *Paragon Coal Co. v. Commissioner of Internal Revenue, supra,* 380 U.S. at 634, 85 S.Ct. 1207. Despite *Paragon,* many lower courts continue to view the length of the contract as a most important circumstance in determining whether a miner has a economic interest in the coal. *See, e. g., Whitmer v. C.I.R.,* 443 F.2d 170 (3rd Cir. 1971).

The October 1967 contract and lease between Vepco and Douglas was for a period of five years and was renewable thereafter on a year-to-year basis. Neither party could terminate without cause. Accordingly, as to criteria 3 in *Parsons,* this Court concludes that Douglas' contract was not terminable without cause on short notice. The contract term was of sufficient duration to be consistent with the acquisition of an economic interest by Douglas.

The fifth criterion from *Parsons* is

(5) [whether] the coal at all times, even after it was mined, belonged entirely to the landowners, and [whether the miners] could not sell or keep any of it but were required to deliver all that they mined to the landowners. (*Parsons, supra,* 359 U.S. at 225, 79 S.Ct. at 663.)

In considering this criterion, it is again important to distinguish between Vepco as lessor and Vepco as the consumer of coal. As a consumer, Vepco did reserve the right to buy, at an agreed price, a minimum monthly tonnage which met certain quality standards. Vepco did not acquire this coal for resale in the market because it was not a coal dealer. Vepco did not treat Douglas as a hired hand who delivered all coal mined. Vepco did not accept inferior coal; Douglas could sell that coal to anyone at whatever price it could get. As to criterion 5 in *Parsons,* this Court concludes that un-

der the agreements, the Herr/Cavitt coal did not belong entirely to Vepco and that Douglas was not required to deliver all coal mined to Vepco.

Criteria 6 and 7 from *Parsons* should be considered together:

(6) [whether the miners] were not to have any part of the proceeds of the sale of the coal, but, on the contrary, they were to be paid a fixed sum for each ton mined and delivered . . . ; and (7) [whether the miners], thus, agreed to look only to the landowners for all sums to become due them under their contracts. (*Parsons, supra,* 359 U.S. at 225, 79 S.Ct. at 663).

In the first place, Douglas did not look to Vepco for any return on inferior coal, and Douglas received all of the proceeds from the sale of that coal.

The parties appear to agree that the key consideration under factors 6 and 7, above, is whether the remuneration which Douglas received under the contract was a true purchase price or whether it was a fixed fee for the service of mining coal. It appears to the Court that Vepco and Douglas intended the contract figures to be actual purchase terms.

The contract speaks solely of "price" and not "fee", "compensation" or some other word associated with the concept of employment.

The negotiated price in the contract was geared to coal prices in the Mt. Storm area. Except for a discount, the equivalent of a royalty to Vepco, the price Vepco paid Douglas for Herr/Cavitt coal was comparable to the price Vepco paid Douglas for coal from Douglas' other mines.

The price terms in the contract were not absolute. First, the price varied depending upon the B.T.U. content of the coal: the lower the B.T.U., the lower the price, and *vice versa.* It appears to the Court that a true hireling would simply mine for a set fee and would not be penalized for poor quality coal. Risks concerning the quality of a mineral after mining are usually as-

sumed by the entrepreneur, not the hireling.

The price was also subject to adjustment. If Douglas changed from a non-union to a union basis, the price could be adjusted to reflect increased costs, not to exceed an increase of 70 cents per ton. The Government argues that "market fluctuations meant nothing" under the agreement. (Initial Brief, p. 18). This assertion is inaccurate because the agreement could be reopened each August for price adjustment. However, any increase or decrease could not exceed 5 per cent of the then existing price being paid by Vepco. The fact that the increase or decrease is limited does not mean that Douglas was not looking to the coal for its return. The price/supply aspect of the agreement was between Douglas, the coal producer, and Vepco, the electric utility attempting to insure itself of a long term supply of coal at a relatively stable price. While Douglas agreed to a limit on price increases, it also protected itself against sharp decreases. Perhaps it was good business judgment for Douglas to protect itself against falling markets. In any event, this Court does not believe a coal producer should lose the depletion allowance simply because it utilizes a contract to safeguard against down side market risks.[15]

As to criteria 6 and 7 in *Parsons*, the Court concludes that Vepco was buying coal, not mining services, from Douglas, and that Douglas accordingly looked to the coal for its return.

■ The Court has some general, conclusory comments about the *Parsons* criteria. It appears to this Court that the thread which ties the several *Parsons* criteria together is the basic question whether the coal operator assumed entrepreneurial-type obligations and risks with respect to the coal itself. That question can be answered in the affirmative here. Douglas assumed all obligations with respect to the coal and its production. It agreed to pay all taxes on the coal. It undertook the substantial and open-ended obligation to reclaim the land according to the State's requirements. Douglas acquired surface rights and obligated itself to pay a royalty to the surface owners so that the coal could be mined. Douglas took all risks with respect to the quality of the coal. The price Douglas received depended on the quality, including B.T.U. content, and Vepco would not accept inferior coal. Douglas could not look to Vepco to satisfy the obligations assumed or to eliminate the risks involved. Instead, Douglas could eliminate the obligations and risks only by producing coal.

■ Finally, this Court believes that one may obtain an interest in property, including minerals, by assuming obligations with respect to such property. Vepco's lease of the Herr/Cavitt coal to Douglas, together with the obligations and risks assumed by Douglas, give Douglas an economic interest or investment in the coal in place which it is entitled to recover through depletion.[16]

■ The Court observes in passing that unless Douglas prevails, no one will receive any percentage depletion allowance on the coal removed from the Herr and Cavitt tracts during the years at issue. The October 1967 agreement specifically provided that Vepco was not a partner, joint adventurer, cotenant or principal with respect to Douglas and the mining operation. Not

---

**15.** The Government correctly points out "that the amended 1970 contract can [not] retroactively determine the federal income tax consequences of plaintiff's for the years 1967 through 1969." However, it is noteworthy that the 1970 Supplementary Agreement contained the *same* price adjustment terms as the October 1967 agreement which is relevant here. The I.R.S.'s 1973 technical memorandum, which granted Douglas depletion for 1970, contained the following analysis of the price terms of the 1970 Supplementary Agreement:

> [The price] is based on the price paid by Vepco as the representative market price for purchases of coal of like quality from similar producers. . . . *The price is also subject to periodic adjustment based on mutually satisfactory terms.* (Emphasis added.)

**16.** The Court did not find it necessary to rely on the Ristroph affidavit in concluding that Douglas had an economic interest in the Herr/Cavitt coal.

only does this provision demonstrate that Vepco did not intend to retain an economic interest in the coal, but it appears to preclude Vepco from claiming any depletion on Herr/Cavitt coal for the years 1967 through 1969. *See* Internal Revenue Code § 631(c); *see generally Bakertown Coal Company, Inc. v. United States,* 485 F.2d 633, 202 Ct.Cl. 842 (1973).

B. *The Legal Expense Issue.*

█ For 1967, the Commissioner disallowed, as an ordinary and necessary expense, $5,000.00 which Douglas paid in attorneys fees relative to the acquisition of coal property. The Commissioner treated the $5,000.00 as a capital expense. Both sides agree that if the Court finds that Douglas is entitled to depletion, then the Commissioner properly treated the $5,000.00 as a capital expense. Since the Court has ruled in Douglas' favor on the depletion issue, the Commissioner's determination on the $5,000.00 item will stand.

█ For 1968, the Commissioner also disallowed, as ordinary and necessary business expense, $3,600.00 in legal expense, again on the basis that the amount was expended in acquiring coal property. Douglas' sworn interrogatory answers establish that none of the $3,600.00 was expended in the "acquisition of property and coal lands." The amount pertained to "collections, judgments and suits." The Government did not respond to this assertion as required by Rule 56(e), F.R.Civ.P.[17] Accordingly, the record before the Court establishes that the Commissioner improperly treated the foregoing $3,600.00 as a capital item. It was an ordinary and necessary expense.

C. *The Vindex Mine Aggregation Issue.*

In its interrogatory answers, Douglas sets forth that on its 1967 and 1968 tax returns, it aggregated its Vindex, Maryland, deep mine operation with the remainder of its operating coal properties for purposes of computing depletion deductions. Douglas had previously elected to aggregate all of its mineral interests into a single operating unit. *See* 26 U.S.C. § 614(c). The aggregation matter was reviewed in connection with the I.R.S.'s audit of Douglas' amended 1964 tax return. The audit report accepts the aggregation, noting that the previous election was binding. The Commissioner, however, in assessing deficiencies for 1967 and 1968, treated the Vindex mine as a separate operating unit, which increased the amount of the deficiency.

Section 614(c) of the Internal Revenue Code permits a taxpayer, for the purpose of computing the depletion allowance, to elect to aggregate separate operating mines which constitute part of an operating unit. However, such an election

shall be binding upon the taxpayer for all subsequent taxable years, except that the Secretary or his delegate may consent to a different treatment of any interest with respect to which an election has been made. (Revenue Code, § 614(c)(3)(C)).

In Revenue Procedure 64–23, the I.R.S. sets forth guidelines for determining what constitutes a single "operating unit" for aggregation purposes. Although the Revenue Procedure deals mainly with oil and gas properties, it does refer specifically to Section 614(c) of the Code, which deals with the aggregation of mining properties. The Revenue Procedure provides, in pertinent part:

SEC. 3. GUIDELINES

The Service will accept the operating unit established by the taxpayer unless there is a clear and concurring basis for a change. . . .

SEC. 5. VALID AGGREGATIONS.

---

**17.** Rule 56(e), F.R.Civ.P., provides in pertinent part:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

.01 A valid election made under section 614(b) *or (c)* of the Code shall be binding on the taxpayer for the taxable year for which made and all subsequent taxable years subject to this Revenue Procedure unless consent to make a change is obtained in accordance with section 6.02 of this Revenue Procedure. (Emphasis added).

.02 An aggregation will not be disturbed if it has been accepted on audit under presently established procedures, unless it is later ascertained a material error was made in such audit. An aggregation will be considered as having been accepted on audit if the audit report shows adjustments to the depletion allowance initially claimed by the taxpayer (attributable to changes in the operating unit) which were agreed to by the taxpayer, or the audit report shows that the depletion claimed by the taxpayer was examined but not adjusted, or where other specific evidence indicates that the depletion deduction was examined and accepted or adjusted. If there is no specific evidence either in the audit report or elsewhere that the depletion deduction was examined, or if there was no audit of the return, the aggregation will not be considered to have been accepted on audit.

The uncontroverted record in this case establishes that Douglas' election to aggregate was "accepted on audit" by the I.R.S. in the examination of Douglas' amended return for 1964. The Government has made no attempt to properly establish that there is a genuine issue for trial with respect to the aggregation issue by submitting counter-affidavits or appropriate evidentiary data, as required by Rule 56(e), F.R.Civ.P.

 Douglas made the election to aggregate. The concept of election is summarized in 10 Mertens, Law of Federal Income Taxation § 60.19 (1976):

The doctrine of election implies that a taxpayer is given the option of freely taking two courses of action; where there is no freedom of choice . . . the [doctrine] is inapplicable.

Once Douglas made the election it was binding. Thereafter, Douglas could not change its procedures to suit its convenience and lower its tax bill. Likewise, it appears to this Court that the I.R.S. cannot require Douglas to switch back and forth simply to suit the advantage of the I.R.S. Once Douglas established, as it did here, that the aggregation was accepted on audit, it was incumbent upon the Government to counter with some information, as required by Rule 56(e), showing that there was some material error in the audit or that there was otherwise some genuine issue about the validity of the aggregation. The Government has failed to do this and the Court concludes that Douglas is entitled to partial summary judgment on the aggregation issue.

## SUMMARY

The Court concludes that Plaintiff Douglas possessed an economic interest in the coal in place on the Herr and Cavitt tracts which entitles it to depletion deductions for calendar years 1967, 1968 and 1969. As to the liability aspect of this issue, it is ORDERED that partial summary judgment be, and is, entered in favor of the Plaintiff and against the Defendant.

The Court concludes that the $5,000.00 in legal fees paid by Plaintiff Douglas in 1967 were capital expenditures relating to the acquisition of coal property and therefore were not deductible as ordinary expenses. As to the liability aspect of this issue, it is ORDERED that partial summary judgment be granted in favor of the Defendant and against the Plaintiff.

The Court concludes that the $3,600.00 in legal fees paid by Plaintiff Douglas in 1968 were ordinary and necessary business expenses and not capital expenditures. As to the liability aspect of this issue, it is ORDERED that partial summary judgment be, and is, granted in favor of the Plaintiff and against the Defendant.

Plaintiff Douglas abandoned the following: (1) its claim that, in computing its

depletion deduction for 1967 and 1968, it was entitled to include in its gross income advance royalties paid on certain non-producing property; and (2) its claim that certain payments to its president in 1967 and 1968 were ordinary and necessary business expenses constituting proper reimbursement for travel and entertainment expense. As to the liability aspect of these two issues, it is ORDERED that judgment be, and is, entered in favor of the Defendant and against the Plaintiff.

The parties are directed to submit to the Court, within 60 days, a judgment order reflecting the sum of Plaintiff's recovery. The judgment order should take into account any statutory interest to which Plaintiff is entitled. (See 26 U.S.C. § 6611). The amount of the recovery appears to the Court to be a matter of arithmetic. The computation, of course, should also take into account the three issues determined in Defendant's favor, which include the two issues conceded by Plaintiff. If the parties are unable to agree on the computation, the Court should be advised so that it may consider appropriate procedures to resolve the computation, or damage, issue.

The Supplementary Agreement, dated January 1, 1970, between Douglas and Vepco will be filed by the Clerk.